## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Trisha K. Farkarlun,

                Plaintiff,

v.

Deputy J. M. Hanning, *individual*;
Sgt. Peterson, *individual*; Deputy B. Novotny,
*individual*; Deputy Sommerfeld, *individual*;
County of Hennepin, *Minnesota*; Chao Lee,
*in his individual capacity*; Karina
Landmesser, *in her individual capacity*;
Marjane Khazraeinazmpour, *in her
individual capacity*; Mark Lanasa, *in his
individual capacity*; Joseph Klimmer, *in his
individual capacity*; Sgt. Daniel Swalve, *in
his individual capacity*; and the City of
Minneapolis,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 10-452 ADM/JJK

_____

Jill Clark, Esq., Jill Clark PA, Golden Valley, MN, on behalf of Plaintiff.

Toni A. Beitz, Esq., Hennepin County Attorney's Office, Minneapolis, MN, on behalf of
Defendants Deputy J. M. Hanning, Sgt. Peterson, Deputy B. Novotny, Deputy Sommerfeld, and
County of Hennepin.

Timothy S. Skarda, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of
Defendants Chao Lee, Karina Landmesser, Marjane Khazraeinazmpour, Mark Lanasa, Joseph
Klimmer, Sgt. Daniel Swalve, and the City of Minneapolis.

_____

## I.  INTRODUCTION

On December 12, 2011, the undersigned United States District Judge heard oral argument

on Defendants County of Hennepin ("Hennepin County"), Deputy Jodie Hannig[1] ("Hannig"),

Deputy B. Novotny ("Novotny"), Sgt. Peterson ("Peterson"), and Deputy Sommerfeld's

_____

[1] Although the caption refers to "Deputy J.M. Hanning," the Defendant's correct name is
Jodie Hannig.

("Sommerfeld") Motion for Summary Judgment [Docket No. 35] ("Hennepin County's

Summary Judgment Motion") and on Defendants Chao Lee ("Lee"), Karina Landmesser

("Landmesser"), Marjane Khazraeinazmpour ("Khazraeinazmpour"), Mark Lanasa ("Lanasa"),

Joseph Klimmek[2] ("Klimmek"), Sgt. Daniel Swalve ("Swalve"), and the City of Minneapolis's

("Minneapolis") Motion for Summary Judgment [Docket No. 44] (Minneapolis's Summary

Judgment Motion").  Plaintiff Trisha K. Farkarlun ("Farkarlun") opposes both motions.  For the

reasons set forth below, Hennepin County's Summary Judgment Motion is granted and

Minneapolis's Summary Judgment Motion is granted.

## II.  BACKGROUND[3]

Plaintiff Farkarlun brings this 42 U.S.C. § 1983 action alleging violation of her

constitutional rights by Defendants during a September 30, 2009 incident.  Integral to her present

claims, however, is a separate incident of alleged police misconduct, the subject of a separate

lawsuit, that she suggests motivated the law enforcement officers here to retaliate against her.

Farkarlun alleges that on July 28, 2007, two Minneapolis Police Department ("MPD")

officers, Barnes and Gillies, raped her.  Decl. of Jill Clark, Esq. filed in Opp. to Summ. J.

[Docket No. 54] ("Clark Decl.") Ex. 9 ¶¶ 19-21.  She went to the hospital for examination that

same day, after which a nurse reported the incident to the MPD.  Id. ¶¶ 22–24.  After

investigating her rape claims, Farkarlun was criminally charged for making a false complaint of

---

[2] Although the caption refers to "Joseph Klimmer," the Defendant's correact name is Joseph Klimmek.

[3] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

police misconduct.  Decl. of Adam S. Richardson Filed in Opp. to Summ. J. [Docket No. 51] ("Richardson Decl.") ¶ 1.  After a jury trial, Farkarlun was convicted of the false report charge. Richardson Decl. ¶ 2.  Around the time of her sentencing in July 2009, Farkarlun initiated a civil lawsuit based on the rape allegations.  Richardson Decl. ¶ 3; Clark Decl. Ex 9.  Farkarlun appealed her criminal conviction and in December 2010, the statute under which she was convicted was invalidated by the Minnesota Court of Appeals on constitutional grounds.  Clark Decl. Ex. 6.  Her criminal trial and civil lawsuit received media attention, particularly from the Minneapolis Star Tribune and law enforcement-oriented internet blogs.  See Richardson Decl. ¶ 3, Ex. A.

On September 30, 2009, some two months after her sentencing and commencing a civil lawsuit against the MPD, Farkarlun joined friends in a downtown Minneapolis bar.  Clark Decl. Ex. 17 ("Farkarlun Dep.") 30:11–31:13.  After leaving the bar around 1 a.m., the car in which Farkarlun was riding was stopped by MPD Officers Defendants Lanasa and Lee.  Aff. of Timothy S. Skarda [Docket No. 47] ("Skarda Aff.") Ex. 1 ("CAPRS Report") 6–7; Farkarlun Dep. 30:11-15.

Lanasa and Lee allege they observed, over live video cameras at the MPD's First Precinct, someone drop a small object on the street, someone else quickly retrieve that object, and then both people making a hand-to-hand transaction, i.e. activity indicative of possible drug dealing.  CAPRS Report 6–7; Aff. of Toni A. Beitz [Docket No. 41] ("Beitz Aff.") Ex. F ("Lanasa Dep.") 16:12–18:24, 33:15-25; Beitz Aff. Ex. G ("Lee Dep.") 12:10–14:3, 15:1–16:9. The people engaging in this activity had no other apparent purpose; they were in an area of

downtown Minneapolis that had no brick-and-mortar businesses.  See Lanasa Dep. 33:3-8.

Lanasa and Lee claim that they immediately left the First Precinct to arrest the suspect, and were

informed over radio that the suspect had departed the area in a vehicle bearing Minnesota license

plate number VMC-973.  CAPRS Report 7.  Lanasa and Lee were also given a description of the

vehicle as a "dark compact car" via radio.  CAPRS Report 6; Lee Dep. 23:4–6.[4]  The vehicle

ultimately stopped by Lanasa and Lee, and in which they found Farkarlun, was a dark green

compact sedan bearing license plate number VMC-973.  CAPRS Report 4.

Farkarlun disputes Lanasa and Lee's version of the events.  First, Farkarlun denies being

the person that dropped anything on the ground.  Farkarlun Dep. 32:8–16.  Second, it appears

Farkarlun disputes that anyone dropped anything on the ground.  While stopping short of directly

stating that Lanasa and Lee retaliated against her by targeting her for a new arrest, implicit in her

claim is an allegation that Lanasa and Lee never had probable cause to suspect drug dealing

because Lanasa and Lee were aware of the rape allegations.  The only support for her contention

that Lanasa and Lee knew of the rape allegations is Farkarlun's proffer that Lanasa admitted he

knows who Officer Gillies is and Lee's admission that he previously knew Officer Barnes.

Lanasa Dep. 10:19–20; Clark Decl. Ex. 18 32:13–25.  Farkarlun also relies on the timing of the

incident, two months after her sentencing and its attendant media coverage.  Pl.'s Mem. Filed in

---

[4]  Farkarlun argues reference to the radio update should be excluded because it is hearsay.
Due to the briefing schedule, the Minneapolis Defendants did not have an opportunity to respond
to that objection.  Regardless, the evidence of the radio communication is admissible either as
non-hearsay, offered only to prove the state of mind of the officers and not the truth of the matter
asserted, or under the present-sense impression exception to the hearsay rule.  See Fed. R. Evid.
801, 803.

Opp. to Summ. J. 6.  Farkarlun argues Lanasa and Lee's stop of the vehicle she was in after only half a block of travel suggests the officers could not have been at the First Precinct in time to do so.  Id. at 7.  She also claims no radio communication exists relaying the plate number of the vehicle, as the officers claim.  Pl.'s Reply to City-Defs. Reply 2–3.  Farkarlun has offered a reproduction from an internet blog of an email from MPD discussing the allegations addressed to "All."  Richardson Decl. Ex. A at 25–26.

When Lanasa and Lee stopped the vehicle Farkarlun was riding in that night, a male passenger admitted to having a small amount of marijuana.  CAPRS Report 6.  Lee searched him and recovered two small individually wrapped baggies of suspected marijuana.  CAPRS Report 6.  Additionally, Lanasa observed an open can of alcohol.  CAPRS Report 7.  Lanasa searched Farkarlun.  Farkarlun Dep. 35:11–20.  He removed her shoes and socks, looked in her mouth, shook her clothing including her bra, and patted her body over her clothing.  Farkarlun Dep. 35:14–19.  Farkarlun claims that during Lanasa's search he pulled down her pants leaving them unbelted and unzipped.  See Farkarlun Dep. 38:11–16.  The shaking of her bra eventually broke it.  Farkarlun Dep. 37:2–5.  Lanasa found no evidence of a crime.

Lanasa's account of the same events varies greatly.  To begin, Lanasa denies ever searching Farkarlun at all.  Lanasa Dep. 46:8.  Next, Lanasa claims that Farkarlun was "moving frantically" as he approached the car.  CAPRS Report 7; see also Lanasa Dep. 37:9–39:21.  Lanasa also claims that he did not unzip or unbelt Farkarlun's pants, but rather that her pants

were unzipped as she exited the vehicle.  Lanasa Dep. 47:4–10.

Lanasa and Lee radioed for a female officer to assist them in searching Farkarlun.  Lee Dep. 28:15.  Defendants Klimmek and Khazraeinazmpour, also MPD officers, arrived at the scene.  CAPRS Report 9.  Khazraeinazmpour, a female officer, searched Farkarlun again but more intrusively–using her gloved hand to search underneath Farkarlun's bra and clothing along Farkarlun's waistline.  Farkarlun Dep. 38:21–25, 111:24–112:2, 112:24–113:3.  Khazraeinazmpour did not reach into Farkarlun's groin area.  Farkarlun Dep. 112:3–4.  This search occurred on the sidewalk in downtown Minneapolis.  Lee Dep. 29:14–18.  Khazraeinazmpour did not find any evidence.  The officers' supervisor, MPD Sergeant Defendant Swalve, also arrived on the scene and authorized a strip search of Farkarlun based on Lanasa's version of events.  CAPRS Report 9; see also Skarda Aff. Ex. 6 ("Swalve Dep.") 10:12–15.

Farkarlun was then taken to the First Precinct.  Farkarlun Dep. 39:2–3.  Upon arriving, the outside of her clothing and her pockets were searched again by a male officer.  Farkarlun Dep. 40:1–17.  No strip search was done, however, because Khazraeinazmpour, the only female officer present, had not been trained in strip searches, and Farkarlun indicated she would refuse any further searching.  CAPRS Report 9; Farkarlun Dep. 41:7.  Farkarlun was taken to Hennepin County Adult Detention Center (the "ADC"), where additional female officers, trained to conduct strip searches, were present to assist Khazraeinazmpour.  CAPRS Report 9.

Farkarlun arrived at the ADC around 2:20 a.m.  Clark Decl. Ex. 3.  Just prior to arriving, Lanasa had filled out paperwork authorizing the detention of Farkarlun.  Clark Decl. Ex. 1.  The paperwork specified that Farkarlun would be "tab-charged," i.e. charged without a complaint drafted by a Hennepin County prosecutor, for a municipal misdemeanor–loitering with intent to buy or sell narcotics.  Id.  In addition, Farkarlun was to be detained overnight, purportedly to prevent further criminal activity.  Id.

Upon arriving at the ADC, Khazraeinazmpour remarked to Hennepin County deputies that she did not know Farkarlun but knew "this year . . . [Farkarlun] has a lawsuit open, or something like that."[5] Clark Decl. Ex. A, Sally Port Video[6] 2:20:51–53.  Farkarlun now avers the Hennepin County Defendants are "afraid" of this evidence.  Pl.'s Mem. Filed in Opp. to Summ. J. 12–13.  However, Khazraeinazmpour's report reflects that at the First Precinct Farkarlun herself informed Khazraeinazmpour of the lawsuit, CAPRS Report 9, a fact Farkarlun did not rebut, Farkarlun Dep. 41:14–17.

---

[5]  The Hennepin County Defendants dispute the substance of what Khazraeinazmpour said. See Hennepin Cnty. Defs.' Reply Mem. of Law [Docket No. 59] 4.  However, after reviewing the video, the Court finds that no reasonable juror could conclude that Khazraeinazmpour said anything other than "I don't know her, but this year . . . she has a lawsuit open or something like that."  Video 2:20:49–53.

[6]  Clark Decl. Ex. A is a video entitled the "Gray Bin Video."  The video itself is divided into three screens, entitled "Sally Port," "Sally Port Wall," and "Property Table."  Citations will refer to the specific screen, e.g. "Sally Port Video," "Sally Port Wall Video," and "Property Table Video."

Defendants Hannig, Novotny, Sommerfeld, and Peterson were on duty at the ADC that night.  Clark Decl. Exs. 3, 4.  Hannig and Novotny are female, Sommerfeld and Peterson are male.  See generally Sally Port Video.  The "Sally Port " is an open area of the ADC where detainees are first brought and the admission process begins.  ADC custom is to remove the outer layers of clothing as processing begins.  Beitz Aff. Ex. K ("Peterson Dep.") 34:4–17.  Although pants are not considered an outer layer, suspects wearing gym trunks or boxers are often required to remove their pants.  Id. 43:19–25.  In about ten percent of cases suspects are reduced to their underwear. 2d Beitz Aff. [Docket No. 60] Ex. Q 36:11–14.  When Farkarlun arrived, the jailers can be heard remarking on how many layers of clothing Farkarlun was wearing, and stating "Get her down to her boxers."  Clark Decl. Ex. 15; Clark Decl. Ex. A ("Sally Port Video") at 2:20:21–30, 2:20:14–33.

Defendant Hannig began the process of removing Farkarlun's clothing by asking her if she had any sharp objects.  Sally Port Video at 2:21:42–43.  Farkarlun responded "no," and then asked to see her lawyer.  Sally Port Video at 2:21:43–46.  Hannig then informed Farkarlun she was going to be searched.  Sally Port Video at 2:21:47.  Farkarlun attempted to turn around and was pressed against the wall by the deputies.  Sally Port Video at 2:21:48–51.  Farkarlun continued to talk to the deputies, stating "Are you going to beat me up?"  Sally Port Video at 2:21:51.  She attempted to turn around again.  Sally Port Video at 2:21:56 –57.  The deputies pressed her against the wall with more force this time.  Sally Port Video at 2:21:57–22:06.  She

repeatedly asked if she was under arrest and for what crime.  Sally Port Video at 2:21:57–22:09.

The deputies then ordered her to sit on the floor.  Sally Port Video at 2:22:09.  She turned around

but did not sit down.  Sally Port Video at 2:22:09–12.  The deputies then used force to take her to

the floor.  Sally Port Video at 2:22:13–18.  With Farkarlun face down on the floor, the deputies

then began forcibly removing her clothing.  Sally Port Video at 2:22:41–25:11.  The female

deputies removed Farkarlun's clothing while the male deputies held her.  Sally Port Video at

2:22:36–25:09.  At various times as her position was changed, she screamed in pain and

indicated her arms and wrists were hurting.  Sally Port Video at 2:22:46–50, 2:22:54–23:12,

2:23:56–2.  During the search process, her buttocks were briefly exposed.  Sally Port Video at

2:22:16.

   After her outer clothing was removed, she was left wearing boxer shorts, a short-sleeved

gray shirt, a white tee shirt, and a sports bra underneath her shirt.  Compare Sally Port Video at

2:25:30 with Aff. of Steven Pondelis [Docket No. 38] Ex. A (property inventory sheet from

ADC).  Farkarlun was frisked by Hannig, and Novotny brushed a metal detector over her

clothing around her body.  2:25:50–26:35.  Novotny adjusted the boxer shorts, again exposing

the upper portion of Farkarlun's buttocks briefly.  Sally Port Video 2:26:09.  Farkarlun then went

into a private bathroom, accompanied by Khazraeinazmpour, Hannig, and Novotny, all female

officers.  Sally Port Video 2:26:53–27:24.  In the private room, a visual strip search was

conducted.  Farkarlun Dep. 66:10–68:9.  No evidence was found.

Next, the female officers exited the bathroom, Farkarlun changed into a jail-issued orange jumpsuit, Farkarlun was finger printed and was frisked manually and with a metal detector again.  Sally Port Video 2:28:49–35:53.  Meanwhile, Deputy Hannig retrieved the bin where Farkarlun's removed clothing had been placed, Sally Port Video at 2:31:27–31, and then took it to the intake counter of the property room, Sally Port Video at 2:35:13–31.  With the camera image frozen for approximately eighteen seconds, but audio still recording, property room attendant Pondelis can be heard saying "Did you see this . . . ?" and Hannig can be heard laughing and saying "Who did that?  You're so funny."  Property Table Video at 2:35:33–51. Farkarlun then went to the property room counter, and the jailer told her he had found a bag of suspected marijuana in the bin.  Farkarlun Dep. 69:1–19.  The suspected marijuana was turned over to the MPD.  CAPRS Report 8–9.  Farkarlun sustained bruised wrists, aggravated an ankle injury, and suffered headaches.  Farkarlun Dep. 17:19–18:1, 62:11–64:20.

The next morning, Farkarlun was arraigned on her misdemeanor charge and was released without bail.  Beitz Aff. Ex. N.  On November 4, 2009, Farkarlun pled not guilty.  Id.  On December 23, 2009, the prosecutor assigned to the case declined to pursue criminal charges, citing a lack of evidence to support a conviction.  Clark Decl. Ex. 5.  This civil action followed. The Hennepin County Defendants (Hannig, Novotny, Sommerfeld, Peterson, and Hennepin County are, collectively, the "Hennepin County Defendants") and the Minneapolis Defendants (Lanasa, Lee, Landmesser, Klimmek, Khazraeinazmpour, Swalve, and the City of Minneapolis

are, collectively, the "Minneapolis Defendants") now move for summary judgment.

## III. DISCUSSION

### A. Summary Judgment Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c));[7] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (same). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

### B. 42 U.S.C. § 1983 Claims

Farkarlun asserts claims under 42 U.S.C. § 1983 against all Defendants.[8] Am. Compl. ¶¶ 31–37. Section 1983 "provides a remedy for deprivations of rights secured by the Constitution

---

[7] The summary judgment standard was previously located in Rule 56(c).

[8] In her brief, Farkarlun states that Defendants Klimmek and Landmesser may be voluntarily dismissed from the suit. Pl.'s Mem. Filed in Opp. to Summ. J. 2. So ordered.

and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . .'" Lugar v. Edmondson Oil Co., 457 U.S. 922, 924 (1982) (quoting 42 U.S.C. § 1983).  Claims under § 1983 may be made against a defendant in either an individual or official capacity.  "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law."  Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citation omitted).

"Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Id. at 165–66 (citing Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690 n.55 (1978)).

Farkarlun has sued Defendants Hannig, Novotny, Peterson, Sommerfeld, Lanasa, Lee, Khazraeinazmpour, and Swalve in their individual capacities.  "When a state actor is sued in her individual capacity, she can plead an affirmative defense of qualified immunity."  Wagner v. Jones, 664 F.3d 259, 260 (8th Cir. 2011) (citation omitted).  At this procedural stage, "[i]n analyzing qualified immunity, we ascertain (1) whether the facts alleged, construed in the light most favorable to the nonmoving party, establish a violation of a constitutional right, and (2) whether such right was clearly established so that a reasonable officer would have known her actions were unlawful."  El-Ghazzawy v. Berthiaume, 636 F.3d 452, 456 (8th Cir. 2011) (citation omitted).  "To be clearly established, there need not be a case decided on all fours with the present factual circumstances."  Wilson v. Lawrence Cnty., 260 F.3d 946, 951 (8th Cir.

2001) (citation omitted).  "Rather, it need only be apparent from pre-existing law that the conduct is unlawful."  Id. (citation omitted).

Additionally, Farkarlun has sued Hennepin County and the City of Minneapolis.  Section 1983 claims may be asserted against municipalities and local governments where a policy or custom of the municipality or local government is the moving force behind a constitutional violation.  Monell, 436 U.S. 694–95.

Farkarlun's claims are numerous and broadly based.  In summary, Farkarlun alleges that her arrest was unconstitutional, each search of her person was unconstitutionally unreasonable, the number and duration of searches of her person was unconstitutional, the force used in effectuating the search of her in the Sally Port area was excessive and unreasonable, the strip search of her was unreasonable, marijuana was planted on her by Hennepin County sheriff deputies in violation of her equal protection and due process rights, and Hennepin County sheriff deputies falsified reports.  Each is addressed below.

### 1.  Arrest of Farkarlun was Constitutional

The Fourth Amendment guarantees the right of citizens to "be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  "The Fourth Amendment, as applied to the States through the Fourteenth Amendment, requires that an officer have probable cause before making a warrantless arrest."  Veatch v. Bartels Lutheran Home, 627 F.3d 1254, 1257 (8th Cir. 2010) (citation omitted).  "Probable cause exists when a police officer has

reasonably trustworthy information that is sufficient to lead a person of reasonable caution to believe that the suspect has committed or is committing a crime." Id. (citations omitted). "In determining whether probable cause exists to make a warrantless arrest, the court looks to the totality of the circumstances . . . ." United States v. Blackmon, 662 F.3d 981, 985 (8th Cir. 2011) (citations omitted). "In determining probable cause, law enforcement officers may draw inferences based upon their experience." United States v. Cortez-Palomino, 438 F.3d 910, 913 (8th Cir. 2006). Police, however, may detain criminal suspects for investigation with less than probable cause if officers have a reasonable suspicion that a crime is being or has been committed. Blackmon, 662 F.3d at 985.

Under the totality of the circumstances, Lanasa and Lee had probable cause to arrest Farkarlun when they removed her from the vehicle. At that time, they had seen, via video camera, someone they believed to be Farkarlun drop a small object on the ground and make a hand-to-hand transaction with someone that had picked up the object. Such activity raises suspicions of drug dealing. Furthermore, a co-passenger in the vehicle admitted to being in possession of marijuana. A search of that passenger yielded several "bindles" of marijuana–packaging consistent with sale rather than mere possession. While the Fourth Amendment does not permit guilt by association, see Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not . . . give rise to probable cause . . . ."), it does allow police officers to use common sense and infer

a common enterprise among co-passengers of a small automobile where drug dealing is likely. See Maryland v. Pringle, 540 U.S. 366, 373 (2003) (ruling it reasonable to infer common enterprise among three passengers of vehicle because quantity of drugs and cash in vehicle indicated likelihood of drug dealing which is "an enterprise to which a deal would be unlikely to admit an innocent person").  Given this collection of evidence, at that point, a person of reasonable caution could believe that Farkarlun was selling marijuana in concert with the male passenger.

Farkarlun attempts to avoid this result by arguing that she was under arrest the moment the vehicle was stopped.  See Pl.'s Reply to City-Defs.' Reply [Docket No. 64] 2.  To support her argument, she cites Lanasa's deposition testimony that he stopped the vehicle with the intent to make an arrest.  See Lanasa Dep. 43:15–44:24 (stating that Lanasa stopped the vehicle in order to arrest Farkarlun but noting he did not remember exactly when he informed her she was under arrest).  Indeed, were an arrest made based solely on the observation of the police of a single incident of suspicious activity, probable cause may well have been lacking.  See, e.g., State v. Connie, No. A09-194, 2009 WL 4910158 (Minn. Ct. App. Dec. 22, 2009) (holding that police officers did not have probable cause to arrest suspect for loitering with intent to distribute narcotics after observing suspect for five minutes and seeing him engage in a single hand-to-hand transfer of a small object); see also United States v. Everroad, 704 F.2d 403, 405 (8th Cir. 1983) ("[P]robable cause requires more than mere suspicion.").  However, Lanasa's subjective

state of mind is *immaterial*.  See Whren v. United States, 517 U.S. 806, 813 (1996) ("Subjective

intentions play no role in ordinary, probable-cause Fourth Amendment analysis."); see also

United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994) ("The subjective intent of the

seizing officer is irrelevant if not communicated to the suspect.").

 An arrest and an investigatory stop are both seizures under the Fourth Amendment.

Bloomfield, 40 F.3d at 916 (quoting United States v. Miller, 974 F.3d 953, 956 (8th Cir. 1992)).

The line between arrest, which must be supported by probable cause, and detention, which need

only be supported by reasonable suspicion, is often vague.  Miller, 974 F.2d at 957 ("There is no

bright line of demarcation between investigative stops and arrests.") (citations omitted).  Factors

to consider in distinguishing between investigative stops and arrests include the duration of

detention, use of force or physical restraint–such as handcuffs or placement in police car–or

transporting the suspect to another location.  Bloomfield, 40 F.3d at 917.  An investigative

detention must be limited to the least intrusive means reasonably available to verify or dispel an

officer's suspicion in a short amount of time.  Id. at 916 (quotations omitted).

 Under Whren, the question is whether Lanasa and Lee's actions, viewed objectively,

were reasonable.  517 U.S. at 811–13.  It is reasonable, and constitutional, to stop and investigate

a vehicle occupied by persons suspected of dealing drugs.  See United States v. Bell, 480 F.3d

860, 863 (8th Cir. 2007) ("The Fourth Amendment permits an investigative stop of a vehicle if

officers have a reasonable suspicion the vehicle or its occupants are involved in criminal

activity.").  When the vehicle was first stopped and before the marijuana was found, Farkarlun

was not under arrest.  She was not taken out of the vehicle.  Farkarlun Dep. 33:13–35:12

(testifying that driver and male passenger were removed out of her sight prior to Farkarlun being

asked to exit vehicle).  She was not yet placed in handcuffs.  Id.  She was not yet told she was

under arrest.  Id.  She was under arrest only after her male co-passenger was discovered to have

on his person marijuana packaged for individual retail.  At that point, Lanasa and Lee had

probable cause to arrest Farkarlun, and therefore the arrest was reasonable.  Lanasa and Lee are

entitled to summary judgment with respect to any claim of unreasonable seizure.

Farkarlun's argument that no probable cause existed because loitering with intent to

distribute, the crime for which she was ultimately charged, requires multiple acts is unavailing.

Section 385.50 of the Minneapolis Municipal Code makes it a misdemeanor to "loiter on the

streets or in a public place or in a place open to the public with intent to solicit for the purposes

of prostitution, illegal narcotic sale, distribution, purchase or possession, or any other act

prohibited by law."  Minneapolis, Minn., Code of Ordinances § 385.50(a).  The ordinance

further instructs:

> Among the circumstances which may be considered in determining whether a
> person intends to loiter for the purpose of engaging in distributing illegal
> narcotics are whether a person: (1) Repeatedly beckons to, stops or attempts to
> stop, or engages passersby in conversation, (2) Repeatedly stops or attempts to
> stop motor vehicle operators . . . (3) acts as a look-out, (4) transfers small objects
> or packages of currency or any other thing of value in a furtive fashion which
> would lead an observer to believe or ascertain that a drug transaction has or is
> about to occur.

17

Id. § 385.50(d).  Farkarlun argues the ordinance requires that Lanasa and Lee view multiple exchanges of small object*s*, rather than a single exchange of a single small object, to establish probable cause for a violation of the ordinance.  As written, loitering with intent has the following elements (1) loitering (2) in a public place with (3) intent to solicit for sale of narcotics or prostitution.  It is not a statutory requirement that multiple small objects, or even any objects, be transferred; the element is merely the intent to sell narcotics or engage in prostitution.  Repeated beckoning or transfer of small objects are merely examples of circumstances that *may* be considered.  Id.

On this record, Lanasa and Lee viewed on a surveillance camera someone walking without apparent purpose and then dropping an object in an area of downtown Minneapolis without any brick-and-mortar businesses, which raised suspicion to believe that person was loitering in a public place.  Then, that same person seemly made a suspicious hand-to-hand transaction with another, who had retrieved the dropped object.  The officers were radioed a description and license plate number of the vehicle that person entered.[9]  Lanasa and Lee stopped

--------

[9]  Farkarlun argues that the radio communication does not exist.  Hennepin County raised the issue of Lanasa and Lee obtaining information regarding the vehicle over radio in their opening brief.  Hennepin Cnty. Defs.' Mem. of Law [Docket No. 37] 2.  Farkarlun did not raise this rebuttal argument until her reply brief, and therefore it will not be considered.  See Berbig v. Sears Roebuck & Co., 568 F. Supp. 2d 1033, 1040 n.10 (D. Minn. 2008) ("Generally, the Court does not consider arguments raised for the first time in a Reply.").  Even if it were considered, the evidence offered in support by Farkarlun would be excluded for lack of foundation.  To show no radio communication exists Farkarlun offers an audio recording of radio communications from the Minneapolis Emergency Communication Center on September 30, 2009.  2d Decl. of

the vehicle.  In the vehicle, they found Farkarlun, who they believed to be the person they had

seen on the surveillance cameras, along with a male in possession of marijuana packaged for

individual sale.  Under the circumstances, the cumulative value of evidence gave the officers

probable cause to believe that Farkarlun was loitering with the specific intent to solicit the sale

of narcotics.

Farkarlun further avers Lanasa and Lee knew of, and were in part motivated by, the rape

allegations she made against Officers Gillies and Barnes.  Even if the evidence did support that

contention, it is immaterial: the subjective motivation of the officers does not matter if their

actions are constitutional.

Farkarlun also seems to suggest as an alternative that Lanasa, Lee, and Officer Jones

(who was working the surveillance camera) never saw *anyone* drop *anything* in a suspicious

manner that night.  Assuming, *arguendo*, that Lanasa and Lee knew that Farkarlun had accused

Barnes and Gillies of rape, no evidence exists from which to infer that Lanasa and Lee fabricated

criminal activity on Hennepin Avenue in order to retaliate against her.  Of record are various

internet blog postings concerning the allegations and posts from the Minneapolis Star Tribune.

As explained below, these are inadmissible as evidence at trial, but even if they were admissible,

none of this material includes a photograph of Farkarlun.  Farkarlun had no previous interaction

---

Jill Clark, Esq. [Docket No. 65] ¶ 2.  That evidence is only probative if the radio communication
to Lanasa and Lee *should have* been there, a proposition for which no evidence has been offered.
To the contrary, the evidence of record is that Lanasa and Lee were in communication with the
First Precinct and not the Minneapolis Emergency Communication Center.

with either Lanasa or Lee.  Farkarlun Dep. 27:17–23 (no prior contact with Lee); 29:23–30:3 (no recollection of prior contact with Lanasa).  Furthermore, the vehicle in which Farkarlun was riding is not hers and is not registered to her.  CAPRS Report 4.  Therefore, even if Lanasa and Lee knew that someone named Trisha Farkarlun had accused Barnes and Gillies of raping her, there is no basis to suggest that Lanasa and Lee recognized her and then targeted the vehicle in which she was riding for the purpose of retaliating against her.

More fundamentally, no admissible evidence exists from which to infer that either Lanasa or Lee knew anything of the rape allegations.  Rules of evidence have been developed over centuries to ensure that juries in our judicial system consider, and base their decisions on, only evidence that is reliable.  See 1 McCormick on Evidence (6th ed.) § 10 ("The common law system of proof is exacting in its insistence on the most reliable sources of information.  This insistence is reflected in the hearsay rule, the documentary originals doctrine, and the opinion rule.").  The internet blog postings are inadmissible because they lack foundation, are irrelevant, and contain hearsay.

With respect to the pages of internet blogs and Star Tribune articles, they are irrelevant because no foundation has been offered from which to infer that Lanasa or Lee ever saw the posting or articles.  No evidence has been offered that Lanasa or Lee read the blogs from which pages were reproduced.  No evidence has been offered that Lanasa or Lee read the Star Tribune.  Therefore, the evidence offered by Farkarlun is not probative in any way of Lanasa and Lee's

knowledge of rape allegations, and is inadmissible.  <u>See</u> Fed. R. Evid. 401, 402 (defining relevance and prohibiting admission of irrelevant evidence).  Furthermore, nothing has been offered from which to infer that the portions of <u>Star Tribune</u> articles reproduced on the blog were in fact accurately reproduced.  Evidence must be authenticated or identified, i.e. the proponent of the evidence be able to establish the evidence is what its proponent claims it is.  Fed. R. Evid. 901.  An anonymous internet blogger cannot verify the authenticity of the articles through an unsworn, out-of-court statement.  Such a statement is hearsay if offered to authenticate the source of the article.  <u>See</u> Fed. R. Evid. 801(c) (defining hearsay).

Farkarlun also seeks to admit a posting from an internet blog including the substance of an email from MPD Sergeant Jesse Garcia ("Garcia").  That email is also inadmissible.  As with the other blog postings, it lacks any relevancy because no evidence suggests Lanasa or Lee ever saw the email.  That the email is addressed to "All" does not mean that the email was sent to every single person Garcia may know.  Nearly any email that is sent to multiple recipients may be addressed to "All."  Only knowledge of the recipients will elucidate what group or class constitutes "All."  Here, the recipients of the email are not disclosed and no evidence links the "All" to either Lanasa or Lee.  Furthermore, the email lacks foundation.  Nothing suggests it was accurately reproduced or that it was in fact written by Garcia.  To the extent Farkarlun relies on the representations of an anonymous blogger as the sole foundation to establish the email was written by Garcia, the statement is hearsay and inadmissible.  Fundamental to our judicial system

is that liability or guilt will be determined only through the use of relevant and reliable evidence. The blog postings offered by Farkarlun are not reliable or relevant to establish whether Lanasa or Lee knew of Farkarlun's rape allegations.

Because they are inadmissible, the blog postings, including the newspaper articles and the email, may not be considered as evidence.  See Firemen's Fund Ins. Co. v. Thien, 8 F.3d 1307, 1310 (8th Cir. 1993) ("The district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.") (citations omitted).  The only remaining evidence is Lanasa's admission that he knows who Gillies is, and Lee's admission that he previously knew Barnes.  Both Lanasa and Lee deny knowing anything about the rape allegations.  From that evidence, it is a leap in logic to believe Lanasa or Lee knew of the allegations.  More importantly, no reasonable juror could infer that Lanasa and Lee recognized Farkarlun on the street, conspired to fabricate a story about seeing her engage in suspicious activity, and then conspired with Officer Jones to radio the plate number of the car Farkarlun boarded, all based solely upon Lanasa's admission that he knows of Gillies and Lee's admission that he once knew Barnes.  That chain of inferences is far too attenuated for a reasonable jury to accept.

Probable cause pivots here on whether Lanasa and Lee actually saw suspicious activity on Hennepin Avenue.  It is undisputed that they believed they stopped the vehicle of their suspect, and that Farkarlun's co-passenger was in possession of marijuana packaged for

individual sale.  No genuine issue exists regarding whether Lanasa and Lee saw the activity they

claim.  Farkarlun has offered no evidence from which to reasonably infer that they did not, and

the burden of proof is hers.  See Der v. Connolly, – F.3d –, 2012 WL 204558, at *5–6 (8th Cir.

2012) (holding plaintiff bears ultimate burden of proof in § 1983 actions premised on Fourth

Amendment violations).

A single remaining issue, not briefed by the parties, warrants mentioning for the sake of

completeness.  Under Minnesota law, a police officer may make an arrest for a misdemeanor

committed or attempted "in the presence" of a peace officer.  Minn. Stat. § 629.34, subd. 1(c).

Minnesota's rule was also the rule at common law, and may be a requirement of the Fourth

Amendment.  See  Virginia v. Moore, 553 U.S. 164, 171 (2008) ("[W]hen an officer has

probable cause to believe a person committed even a minor crime in his presence . . . [t]he arrest

is constitutionally reasonable.") (citation omitted).  Some courts have held that observing

activity over a video camera does not satisfy the "in the presence" requirement.  E.g., City of

Everett v. Rhodes, No. 48098-7-I, 2002 WL 31863477, at *1–3 (Wash. Ct. App. Dec. 23, 2002).

Minnesota courts, however, have not addressed this issue.  Regardless, Farkarlun seeks relief

under the laws of the United States only, not the laws of Minnesota.  See 42 U.S.C. § 1983.  It is

an unresolved question of whether the Fourth Amendment requires that a crime be committed in

the presence of an officer for a valid warrantless misdemeanor arrest to occur, and therefore the

officers are entitled to qualified immunity on that issue.  See Veatch v. Bartels Lutheran Home,

627 F.3d 1254, 1258–59 (8th Cir. 2010) (noting that Supreme Court has never decided whether

Fourth Amendment permits warrantless arrest for misdemeanor committed outside presence of

arresting officer, also noting that prevailing view of other circuits is that it does not, and stating

that any "in the presence" requirement is "far from clearly established").

### 2. Lanasa is Entitled to Qualified Immunity for Alleged Public Street Search

The second basis Farkarlun identifies for her claims is the first search of her person,

which she claims was conducted by Lanasa on the street.  A search may be made without a

warrant incident to a custodial arrest.  Curd v. City Court of Judsonia, Ark., 141 F.3d 839, 842

(8th Cir. 1998).  A search incident to arrest, however, is not unlimited in scope.  See id. (noting

that search must be contemporaneous with arrest and within area of arrestee's immediate

control).  For example, "the interests supporting a search incident to arrest would hardly justify

disrobing an arrestee on the street . . . ."  Illinois v. Lafayette, 462 U.S. 640, 645 (1983).  Partial

disrobing is also disfavored, but may be permissible if a suspect's private areas are not exposed

and officers take "steps commensurate with the circumstances" to diminish the potential

invasion of a suspect's privacy.  United States v. Williams, 477 F.3d 974, 977 (8th Cir. 2007).

Searching of a suspect by an officer of the opposite sex that involves intimate touching has also

been held unreasonable.  See Byrd v. Maricopa Cnty. Sheriff's Dept., 629 F.3d 1135, 1142 (9th

Cir. 2011) (ruling search conducted by female corrections officer that involved touching male

inmate's genitals through boxer shorts was unreasonable); see also Amaechi v. West, 237 F.3d

356, 361–62 (4th Cir. 2001) (holding search unreasonable where male officer searched female misdemeanant suspect over bathrobe in sexually invasive manner).

Although Lanasa denies ever conducting any search of Farkarlun's person, all factual disputes must be construed in favor of Farkarlun who claims Lanasa, a male officer, unbelted, unzipped, and pulled her pants down, exposing her underwear, in the middle of a public street, taking no steps to protect her privacy. Lanasa felt around her waistline, looked into her mouth, reached into both her front and back pockets, rubbed the front of her pants, and removed her shoes and socks. Farkarlun Dep. 106:16–107–17 (describing scope of search). She claims her bra was shaken so violently that it broke. If Farkarlun's testimony is to be believed, a search including pulling a suspect's pants down in public and shaking a bra so hard it breaks is unreasonable, particularly in light of the search being of a female by a male. For his part, Lanasa claims he never searched Farkarlun and her pants were down only because she had them unzipped in the car before as the officers approached the vehicle. The factual scenario presents the familiar "he said–she said" dispute usually best resolved by a jury.

Here, however, Lanasa, as a police officer, is entitled to qualified immunity if the search occurred as described by Farkarlun. The scope of a search incident to arrest includes any place within the control of the suspect where weapons, instruments of escape, or evidence may be located. Chimel v. California, 395 U.S. 752, 763 (1969). Therefore, a reasonable officer in Lanasa's position could have believed that reaching into Farkarlun's pockets, shaking her bra,

and removing her shoes and socks was reasonable.  Small bindles of marijuana are easily

secreted in the clothing areas Lanasa is claimed to have searched.  The search, although on a

public street, was conducted around 1:00 or 1:30 a.m. on a Wednesday morning, and there is no

evidence of any uninvolved bystanders observing the incident.  The cross-gender aspects

increased the intrusion on Farkarlun, but cross-gender searches are not per se unreasonable.  A

reasonable officer in Lanasa's position could have believed a cross-gender search to be

permitted, particularly because the intrusiveness of the search was well below that found in <u>Byrd</u>

and <u>Amaechi</u>.  If Farkarlun's pants were lowered without any measures to protect her privacy,

the Court is troubled by the invasion, especially if Farkarlun's buttocks were briefly exposed.[10]

However, the evidence of record is that any lowering of the pants was an accidental effect of the

search, not an intentional result.  <u>See</u> Farkarlun Dep. 107:15-17 ("Q: . . . What was he doing

when your pants came down? A: He was searching me, searching my pockets.").  Because there

is no evidence Lanasa intended to lower Farkarlun's pants, he could not have taken any steps to

protect her privacy.  As a practical matter, he could not have known that additional steps to

protect her privacy would be required.  Therefore, he is entitled to qualified immunity and

summary judgment.

---

[10] The record on exposure, if any, is unclear.  At her deposition Farkarlun testified only that she told Lanasa that her "butt was showing" and not that her buttocks were actually exposed. <u>See</u> Farkarlun Dep. 38:7-8.

### 3.  Khazraeinazmpour is entitled to Qualified Immunity for Second Search on Street

The next basis for Farkarlun's claims is the second search on the street conducted by Khazraeinazmpour, the female officer called to the scene.  Whether a search is reasonable under the Fourth Amendment requires a balancing of the scope of the intrusion, the manner in which it is conducted, the justification for initiating the search, and the place in which it is conducted. Bell v. Wolfish, 441 U.S. 520, 559 (1979).  In conducting that balancing, "reach-in" searches that do not display the suspect's genitals to onlookers are reasonable if police take "steps commensurate with the circumstances" to diminish the potential invasion of a suspect's privacy. Williams, 477 F.3d at 977.  In Williams, a pat-down search revealed something inside a suspect's pants. Id. at 975.  Police then transported the suspect to a police building parking lot, in a residential area, surrounded by a building, brick wall, and chain link fence. Id.  A police officer wearing a latex glove then reached into the suspect's underwear, near his genitals, and removed contraband. Id.  The search was upheld, the Eighth Circuit reasoned that officers had taken sufficient precautions to protect Williams' privacy and no evidence suggested that an observer would have seen private areas of Williams' body or seen any contact between Williams' genitals and the officer's gloved hand. Id. at 977.

Khazraeinazmpour is entitled to qualified immunity because her search of Farkarlun did not violate any clearly established law.  When Khazraeinazmpour arrived on the scene, Lee informed her that he and Lanasa believed Farkarlun was secreting drugs on her person.  CAPRS

Report 9.  She had no reason to doubt that assertion; in fact, Khazraeinazmpour observed

Farkarlun's pants were already unzipped.  Id.  She was entitled to rely on Lee and Lanasa's

representations.  See Doran v. Eckold, 409 F.3d 958, 965 (8th Cir. 2005) (noting that it is a

"settled principle" that law enforcement officers may rely on information provided by other

officers so long as reliance is reasonable).

Construing all factual disputes in Farkarlun's favor, in light of the circumstances, an

officer in Khazraeinazmpour's position could have believed the search to be lawful.  A search

incident to arrest is limited in scope to searches for weapons, evidence, and instruments of

escape.  Chimel, 395 U.S. at 763.  Suspects in possession of drugs or other contraband often

secret them in the elastic bands of undergarments.  See, e.g., United States v. Moore, No. 1:07

CR 134, 2007 WL 2115004, at *1 (N.D. Ohio July 20, 2007) (noting bags of crack cocaine were

discovered in defendant's waistband area between long johns and underwear).  Therefore, an

officer in Khazraeinazmpour's position could have believed searching Farkarlun's waistband

was reasonable and reaching into her bra was reasonable, given that Khazraeinazmpour did not

contact or expose Farkarlun's breasts or genitals.

In light of Williams, discussed above, that no steps were taken to protect Farkarlun's

privacy is concerning, but does not defeat qualified immunity.  To the extent

Khazraeinazmpour's search was a "reach-in" search requiring "steps commensurate with the

circumstances" to diminish potential invasions of privacy, it was not clearly established law to

28

an officer in Khazraeinazmpour's position.  Cases discussing "reach-in" searches, such as

Williams, have focused on two factors, neither of which was present here.  First, courts have

focused on intimate contact between an officer's hand and the suspect's genitals.  See Williams,

477 F.3d at 976 (rejecting per se rule that physical contact with genitals is unreasonable search);

United States v. Edwards, – F.3d –, 2011 WL 6825360, at *6–7 (4th Cir. 2011) (holding search

unreasonable where officer used knife to cut bag of drugs off of suspect's penis); Byrd, 629 F.3d

at 1142 (touching male inmates genitals through clothing by female officer held

unconstitutional).  Second, courts have focused on the visual inspection of a suspect's private

areas and the risk of exposure to others.  Williams, 477 F.3d at 977 (holding search reasonable

because police took steps to protect privacy and there was no evidence that an onlooker would

have seen private areas or contact between officer and suspect's private areas); Campbell v.

Miller, 499 F.3d 711, 715–18 (7th Cir. 2007) (holding search unreasonable where police undid

suspect's belt buckle, pulled pants partially down, and visually inspected buttocks for contraband

in open backyard); Foster v. City of Oakland, 675 F. Supp. 2d 992, 1004 (N.D. Cal. 2009)

(ruling search was unreasonable where police briefly pulled suspect's pants away from body and

looked into them with flashlight in middle of street).  Here, however, Khazraeinazmpour did not

directly contact any of Farkarlun's private areas.  Nor was her search for the purpose of visual

inspection.  Notably, Khazraeinazmpour did not fully reach into Farkarlun's undergarments.  A

reasonable officer in Khazraeinazmpour's position could have believed that the search was less

intrusive than the search in <u>Williams</u> and related cases and did not require additional steps to protect privacy.

While it is concerning that a portion of Farkarlun's buttocks may have been briefly exposed, <u>see</u> Farkarlun Dep. 114:15–16 ("I think like a little bit of it [Farkarlun's buttocks] was [exposed] while she was searching me and my pants kept falling down."), that concern does not defeat qualified immunity. No evidence suggests any person, including Khazraeinazmpour, saw the exposure. Nothing suggests that Khazraeinazmpour searched Farkarlun in a manner that would have intentionally caused Farkarlun's buttocks to be exposed. To the contrary, if Farkarlun's buttocks were exposed, it was due to her pants being unzipped and falling down, *not* the search. There is no evidence Khazraeinazmpour unzipped Farkarlun's pants. <u>See</u> CAPRS Report 9 (pants unzipped upon Khazraeinazmpour's arrival). Objectively evaluated, an officer in Khazraeinazmpour's position could have believed such a search was reasonable in light of its justification and the means used. Qualified immunity is appropriate and Khazraeinazmpour is entitled to summary judgment for her search of Farkarlun.

### 4. Search at First Precinct Was Reasonable

Farkarlun was searched yet again by an MPD officer upon arriving at the First Precinct. Farkarlun avers the repetitive searching and the long duration of searching render this search unconstitutional. However, continuing searches over a period of time with the same factual basis for probable cause are not per se unconstitutional or unreasonable. <u>Cf.</u> <u>United States v.</u>

Carter, 854 F.2d 1102, 1107 (8th Cir. 1988) (holding "return search" conducted several hours after first search did not violate Fourth Amendment).  Without precluding the possibility that some number of searches or length of searches may eventually rise to the level of a constitutional violation, Farkarlun has not identified any authority that the continued searches were excessive nor articulated another reason why the search at the First Precinct was unreasonable.  Therefore, to the extent that continuing the search at the First Precinct was unconstitutional, that constitutional norm has not yet been clearly established, and the searching officer is entitled to qualified immunity.  The Minneapolis Defendants are entitled to summary judgment on this claim.

### 5. Swalve's Authorization of the Strip Search was Reasonable

At the First Precinct, Sergeant Swalve authorized a strip search of Farkarlun.  A strip search of an arrestee, such as Farkarlun, is constitutionally permissible when there is reasonable suspicion that a suspect is concealing contraband on her person.  See Jones v. Edwards, 770 F.3d 739, 741–42 (8th Cir. 1985).  Swalve is entitled to qualified immunity.

It is undisputed that Swalve authorized the search based on the information provided to him by Lanasa.  Swalve is entitled to rely on information provided by others in law enforcement so long as the reliance is reasonable.  Doran, 409 F.3d at 965; see Kraushaar v. Flanigan, 45 F.3d 1040, 1046 (7th Cir. 1995) (finding "nothing improper" about procedure of jailer performing strip search based solely on representations of arresting police officer).  Lanasa informed Swalve

that he had seen Farkarlun making a suspicious transaction, Farkarlun's co-passenger had marijuana packaged for individual sale, Farkarlun had been moving frantically when the vehicle was stopped, and her pants were unbuttoned and unzipped.  CAPRS Report 7–8.  Given that information, Swalve had a reasonable suspicion Farkarlun was concealing contraband. Farkarlun has adduced no evidence to demonstrate Swalve's reliance on Lanasa's version of events was somehow unreasonable.  Swalve is entitled to summary judgment.

Tacitly recognizing the likelihood of this outcome, Farkarlun has advanced a novel legal theory to avoid it.  She argues that law enforcement should not be able to sanitize its action by having one officer fabricate facts rising to probable cause or reasonable suspicion, report them to a supervisor, and then have a supervisor authorize the action.  See Am. Compl. ¶ 9f (alleging that police officers should not be allowed to manufacture a "empty head white heart" defense by seeking authorization for acts based on fabricated factual basis).  The Court declines to adopt Farkarlun's legal theory and extend the law in this way because it is wholly unnecessary.

Individual capacity suits seek to impose personal liability on a state actor.  Wagner v. Jones, 664 F.3d 259, 268 (8th Cir. 2011).  Therefore, liability under § 1983 requires personal wrongdoing.  See Wilson v. Northcutt, 441 F.3d 586, 591 (8th Cir. 2006) ("Liability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed.").  Because of that tenet, it would be unjust for Swalve to be held personally liable for relying on information upon which he was entitled to rely.

However, that is not to say liability will not attach somewhere if authorization was based on fabricated or falsified evidence.  Fabricating evidence or falsifying records may constitute a due process violation.  McGhee v. Pottawattamie Cnty., 547 F.3d 922, 932 (8th Cir. 2008).  Under § 1983, damages are available for due process violation subject to traditional notions of causation.  See Carey v. Piphus, 435 U.S. 247, 266–67 (1978) (looking to common law of torts to determine damages for § 1983 claim).  Farkarlun, however, has not advanced any other theory of liability for her strip search other than to place culpability with Swalve.  Succinctly put, no evidence exists from which to infer Swalve is culpable.  Farkarlun cannot rest her case on blanket allegations of wrongdoing.  It is her burden to prove the essential elements of her case.  Summary judgment as it relates to this theory is granted.

### 6. Visual Strip Search

Visual strip searches are not prohibited by the Constitution so long as they are reasonable.  See, e.g., Wolfish, 441 U.S. at 558–59 (upholding visual strip searches of inmates).  Here, Farkarlun avers the search in the ADC bathroom, a routine visual strip search, was unreasonable because Novotny and Hannig did not follow Hennepin County procedure and it was for an improper purpose.  Violations of Hennepin County procedures cannot form the basis for a § 1983 claim; § 1983 vindicates only federal rights.  Doe v. Gooden, 214 F.3d 952, 955 (8th Cir. 2000) (citing Ebmeier v. Stump, 70 F.3d 1012, 1013 (8th Cir. 1995)).  Furthermore, no improper purpose exists.  It is undisputed that Farkarlun was subject to a visual strip search

33

because she was being admitted to the ADC on a tab-charge and MPD officers, particularly

Lanasa, had represented that they were sure Farkarlun was concealing drugs on her person.  All

officers involved in the strip search–Khazraeinazmpour, Hannig,[11] and Novotny–were entitled to

rely on the information if reliance was reasonable.   Doran, 409 F.3d at 965.  Their reliance was

not rendered unreasonable by the unsurprising fact that a criminal suspect denied wrongdoing;

officers are not required to conduct "mini-trials" on the scene.  Cf. Borgman v. Kedley, 646 F.3d

518, 523 (8th Cir. 2011) (noting that officers are not required to conduct "mini-trial" before

making arrest).  The purpose of Hannig and Novotny, women jailers who were trained in strip

searches, was also to assist Khazraeinazmpour, who stated she was not trained to conduct strip

searches and was unsure how to do it.  Sally Port Video 2:20:58–21:14 Farkarlun has offered no

authority that there is anything improper about cross-agency cooperation.  Cross-agency

cooperation is reasonable, particularly where, as here, cooperation was to protect officer safety

by increasing the number of trained law enforcement officers present.  Therefore, Defendants are

entitled to summary judgment on this theory.

---

[11] Farkarlun suggests that because Hannig was not nearby when Lanasa and Khazraeinazmpour were discussing their suspicions, Hannig was never told Farkarlun was concealing, and therefore had no information on which to rely. Pl.'s Mem. Filed in Opp. to Summ. J. 34.  This argument is speculation, which is not properly considered on summary judgment.  Bloom v. Metro Heart Grp. of St. Louis, Inc., 440 F.3d 1025, 1028 (8th Cir. 2006). Furthermore, Hannig was present when her supervisor, Peterson, ordered a strip search.  Sally Port Video  2:26:30–2:27:00.  At a minimum, Hannig is entitled to qualified immunity because a reasonable officer would have believed she could conduct a strip search in light of Peterson's orders.

**7.  Individual Hennepin County Defendants are Entitled to Qualified Immunity for Sally Port Search and Take Down**

From the First Precinct, Farkarlun was taken to the ADC where Defendants Hannig, Sommerfeld, Novotny, and Peterson forced her to the ground and forcibly removed her outer layers of clothing.  Farkarlun avers the takedown was an excessive use of force and that removing her clothing was an unreasonable search.  Hannig, Sommerfeld, Novotny, and Peterson are entitled to qualified immunity on both accounts.

The timing of Farkarlun's incident–September 2009–is significant.  For some fifteen years prior to June 2011, it was an "open question" in the Eighth Circuit whether excessive force claims required some minimum level of injury.  Chambers v. Pennycook, 641 F.3d 989, 904 (8th Cir. 2011).  In Chambers, the Eighth Circuit clarified that a use of force may be unreasonable, and unconstitutional, even if it causes only *de minimis* injury.  Id. at 906.  Given the state of law prior to Chambers, however, a reasonable officer could have believed that a use of force would be constitutional so long as no more than *de minimis* injury occurred, and therefore an officer is entitled to qualified immunity for uses of force prior to Chambers that in fact caused only *de minimis* injuries.  Id. at 908–09.

The officers here are entitled to qualified immunity because Farkarlun sustained only *de minimis* injury as a matter of law.  Although she vociferously complained of pain on the recording, the evidence of record is that Farkarlun sustained some bruising on her wrists, aggravated a prior ankle sprain, and suffered headaches.  These are they type of injuries that

35

have been classified as *de minimis* as a matter of law.  See <u>Wertish v. Krueger</u>, 433 F.3d 1062,

1067 (8th Cir. 2006) (noting that minor scrapes and bruises and aggravation of prior shoulder

condition were *de minimis* injuries); <u>Foster v. Metro. Airports Comm'n</u>, 914 F.2d 1076, 1081

(8th Cir. 1990) (holding that allegations that handcuffs were applied too tightly could not support

excessive force claim without medical records of long-term injury or other evidence of

permanent injury).

      Farkarlun further avers the removal of the outer layers of her clothing was an

unreasonable search.  "The test of reasonableness under the Fourth Amendment is not capable of

precise definition or mechanical application."  <u>Wolfish</u>, 441 U.S. at 559.  Rather, courts "must

consider the scope of the particular intrusion, the manner in which it is conducted, the

justification for initiating it, and the place in which it is conducted." <u>Id.</u> (citations omitted).

      The scope of the intrusion here is that Farkarlun's clothing was removed until she was

only wearing a pair of boxers, bra, short-sleeved button-up shirt, and tee shirt.  She was then pat-

searched and frisked with a metal detector.  The manner of the search was through forcible

removal of the outer layers of Farkarlun's clothing.  The justification was to find contraband

believed to be secreted both as evidence and to protect the security of the ADC, where she was

to be detained overnight.  The place was the Sally Port of the ADC.

      Without deciding the constitutionality of the search, the officers are entitled to qualified

immunity.  The forcible manner of the search was occasioned by Farkarlun not cooperating and

stating she would not consent to be searched.  There is nothing inherently unreasonable about a male officer using force on a female suspect.

The scope of the intrusion combined with the place, however, is more concerning. Farkarlun was reduced to wearing only boxer shorts to cover her lower body.  Such minimal covering enhanced the risk that accidental exposure of private areas could occur–and indeed the upper portion of her buttocks were briefly exposed.  Because the Sally Port of the jail is quasi-public, officers of both genders are present and able to view any exposure of private body parts, and inmates of both genders are in adjacent rooms.  Nonetheless, the officers are entitled to qualified immunity because it would not have been clear to a reasonable officer that they could not require her to remove clothing down to her boxer shorts.

Cases addressing the reasonableness of searches involving undergarments typically focus on cases where undergarments are intentionally removed and private areas are necessarily exposed for the purposes of visual inspection.  This was not the case here.  Rather, Farkarlun's outer clothing was removed to increase the efficacy of the pat search and metal detector frisk. These are legitimate interests and it is reasonable to remove outer layers of clothing, to a level not offensive, such as a single layer above the undergarments.  Persons of usual sensibilities are not offended or humiliated if they are viewed in public wearing a single layer of clothing over their undergarments.  Indeed, such attire is common during summer months.

However, Farkarlun's clothing was removed such that she had only undergarments

covering her lower body in an area viewable by persons of both genders.  A reasonable person

could find this offensive.  Nonetheless, the officers are entitled to qualified immunity because

there is no evidence of record indicating that they knew or should have known that Farkarlun's

boxer shorts were her last layer of clothing.  Boxers are not undergarments commonly or

traditionally worn by women.  When women do wear boxers, they are often worn over more

traditional undergarments; in fact, Farkarlun could not recall whether she was wearing her

boxers over additional underwear that day.  Farkarlun Dep. 111:22-23.  The statement of the

officers that they would "get her down to her boxers" is inculpatory only when viewed in

hindsight with the knowledge that Farkarlun was not wearing more underneath her boxers and

that her buttocks would ultimately be exposed.  Hindsight vision is not a proper analysis of law

enforcement action.  Farkarlun was wearing several layers of clothing.  An officer of reasonable

caution, with the knowledge equivalent to that possessed by Hannig, Peterson, Sommerfeld, and

Novotny, would not have known that removing Farkarlun's clothing except for her boxers would

create a risk of exposure of her private areas.  Therefore, they are entitled to qualified immunity.

### 8.  **Monell** claim against Hennepin County

In addition to suing individual officers, Farkarlun asserts claims against Hennepin

County directly.  Hennepin County is liable if Farkarlun suffered a constitutional violation and

Hennepin County was the "moving force" behind the violation.  Municipalities may be liable

under § 1983 for unconstitutional action that is undertaken according to a policy or custom

adopted by the municipality.  Monell, 436 U.S. at 690.  A custom need not have received formal

approval.  Id. at 691.  A custom is demonstrated by (1) existence of a continuing, widespread,

persistent pattern of unconstitutional misconduct, (2) deliberate indifference to or tacit

authorization of such conduct by policymaking officials after notice of the misconduct, and (3)

the plaintiff's injury was caused by the custom that was the moving force behind the

constitutional violation.  Ware v. Jackson Cnty., 150 F.3d 873, 880 (8th Cir. 1998).

Farkarlun claims two Hennepin County policies are unconstitutional because they do not

provide sufficient guidance.  While this argument might have been styled as a claim that

Hennepin County has a custom of failing to adequately train its sheriff deputies rather than a

claim the policy itself is unconstitutional, the distinction is immaterial because both types of

claims require an underlying constitutional violation.  McCoy v. City of Monticello, 411 F.3d

920, 922 (8th Cir. 2005).  Farkarlun has not adduced evidence of any such violation.  The two

constitutional violations Farkarlun identifies are (1) unreasonable search premised on the

practice of removing layers of clothing in the Sally Port and (2) excessive force premised on the

practice of taking "squirmy" suspects to the floor through force.  Each is considered in turn

below.

### a.  Partial Disrobing

The Sally Port area of the ADC is a transitional area between the jail itself and the

outside world.  The staff in the Sally Port are male and female Hennepin County sheriff deputies.

Adjacent to a Sally Port on one side are holding cells. Adjacent to the Sally Port on another side is a property room where inmates turn over property not allowed into the jail and a waiting room where inmates wait to enter the jail.

Hennepin County sheriff deputies typically remove outer layers of clothing, leaving a single layer above undergarments. The rationale for doing so is to increase the efficacy of pat searches, reducing safety risks to deputies. Deputies often remove pants when someone is wearing shorts or other clothing underneath pants and above the undergarments. In about ten percent of cases, however, suspects are reduced to wearing only their underwear, typically boxer shorts, covering their lower body. Hennepin County has not adopted any formal, written policy regarding the amount of clothing to be removed in the Sally Port.

Hennepin County is entitled to summary judgment as it relates to a custom of removing clothing because Farkarlun has not met her burden of creating a genuine issue of material fact that there is a pattern of unconstitutional misconduct at the ADC. A reasonable juror could conclude that ten percent is a widespread and persistent pattern of conduct. The conduct, however, is not unconstitutional. The Eighth Circuit has recognized that requiring a suspect to disrobe to her undergarments "while intrusive to a degree, present[s] a lesser invasion of privacy than a full strip search." Smook v. Minnehaha Cnty., 457 F.3d 806, 812 (8th Cir. 2006). "[S]earches requiring a person to disrobe completely have a uniquely invasive and upsetting nature." Id. (internal quotations omitted). Moreover, the viewing of a suspect in underwear by a

40

law enforcement of the opposite gender is not per se unreasonable.  See Schmidt v. City of Bella Villa, 557 F.3d 564, 573–74 (8th Cir. 2009) (holding search by male officer that required female to partially disrobe for purpose of photographing tattoo was reasonable); see also Byrd, 629 F.3d at 1142 (noting that it is not unconstitutional for female corrections officers to view, without intimately contacting, male inmates in states of undress).  Therefore, without any per se rules, the constitutionality of Hennepin County's custom turns on a balancing of the need to partially disrobe suspects against the invasion of personal rights that search entails.  Bell, 441 U.S. at 559.

Under the Bell balancing test, Hennepin County's custom is reasonable.  The justification for the search is to increase the efficacy of a pat-down and frisk with a metal detector.  Hennepin County's interests in preventing contraband and weapons from being admitted into the ADC and ensuring the safety of jailers are justifications entitled to considerable weight.  The scope and manner of the intrusion are not unreasonable.  On this record, suspects, both men and women, are never left in a state undress less than boxer shorts and a shirt.  This is a state of undress that is not particularly invasive or humiliating.  The presence of officers of the opposite gender is not unreasonable; nothing indicates that opposite-gender officers are unprofessional or do more than passively observe to ensure safe and orderly admission into the jail.  Finally, the place of the search–the Sally Port–is somewhat more troublesome but not unconstitutional.  Opposite gender inmates are present in adjacent rooms and cells.  However, on this record, nothing indicates that any of the events in the Sally Port are visible to those adjacent places, and as such the location of

the search is not unreasonable.  Cf. Williams, 477 F.3d at 977 (holding that search into suspect's underwear was reasonable when done in partially secluded parking lot blocked from public view by fence and vegetation).  The custom of partially disrobing suspects is not unreasonable, and therefore Hennepin County is entitled to summary judgment on this theory of liability.

### b.  Use of Force on "Squirmy" Suspects

After the events in the Sally Port involving Farkarlun ended, Peterson remarked on the recording, "That's what we do, if they get a little squirmy we take them to the floor."  Farkarlun avers this evinces a custom of the use of excessive force.  Not so.  There is nothing repugnant to the Constitution about using force to ensure compliance with lawful orders.  The Sally Port is an area of heightened concern for officer safety.  The Sally Port separates those confined in jail from the outside world.  As suspects enter the Sally Port, the reality of imminent confinement becomes increasingly salient.  This is an area of high risk for resistance, which threatens both officer safety and the orderly administration of the jail itself.  Therefore, it is reasonable to use some force to ensure compliance from suspects that are actively resisting, i.e. being "squirmy."  See Wertish, 433 F.3d at 1066 (holding that it was objectively reasonable for police officers to use force to pull suspect from truck that was not complying with orders to exit).  Of course, even if force is justified, the amount of force may be excessive.  However, Farkarlun has adduced no evidence that the amount of force applied to "squirmy" subjects is not reasonable.  Some use of force is obviously appropriate on suspects who do not comply with orders.  See id. at 1066–67

(noting that some force is reasonable even when a suspect is passively resistant).  To prevail

Farkarlun must present evidence that the custom is to use an *unconstitutional amount* of force.

She has not done so.  The Hennepin County Defendants are entitled to summary judgment as it

relates to the custom of taking "squirmy" inmates to the ground.

### 9.  Drug Planting and Falsifying Reports

The final bases for Farkarlun's claim of a constitutional violation under § 1983 relate to

her allegation that drugs were planted among her belongings and the Hennepin County jailers

falsified reports.  She avers such action violates her due process and equal protection rights.  The

constitutional dimensions of this claim, however, need not be addressed because Farkarlun's

claim fails on evidentiary grounds.

Section 1983 allows recovery for constitutional violations.  See 42 U.S.C. § 1983.

Section 1983, however, requires more than merely establishing a constitutional violation

occurred.  In particular, § 1983 requires evidence of causation.  Causation requires evidence

linking a particular defendant to the acts alleged to be a constitutional violation.  See Martin v.

Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (dismissing § 1983 claims against defendant not

alleged to be personally involved in or have direct responsibility for alleged constitutional

violations); see also Wilson, 441 F.3d at 591 ("Liability for damages for a federal constitutional

tort is personal, so each defendant's conduct must be independently assessed.").

To the extent drugs were planted among Farkarlun's clothing, her claim fails because she

has not adduced any evidence of the identity of the person planting drugs.  The sole theory advanced by Farkarlun is that Defendant Hannig planted drugs among Farkarlun's clothing as Hannig reached into the gray bin containing the clothing and adjusted them.  Pl.'s Mem. Filed in Opp. to Summ. J. 24.  Farkarlun argues that Hannig then took the bin to the property room with Defendant Peterson and laughed about having planted drugs.  Id. at 24, 38–39.  This theory necessarily fails because after reviewing the video, no reasonable jury could conclude that Hannig planted drugs as she reached into the gray bin.  Hannig rearranges the clothing once with her right hand.  Sally Port Video at 2:31:24–31.  Hannig's right hand is clearly visible and is clearly empty.  Sally Port Wall Video at 2:31:25.  Hannig then again rearranges the clothing with both hands before taking it to the property window.  Sally Port Video 2:35:10–16.  Again, her hands are clearly visible and clearly empty.  Sally Port Video 2:35:07–9 (left hand empty); Sally Port Wall Video 2:35:10 (right hand empty).  The Hennepin County Defendants are entitled to summary judgment as it relates to drug planting.

Finally, with respect to falsifying reports, Farkarlun has not adduced any evidence of any false statements in the reports.  Hannig, Novotny, Peterson, and Sommerfeld all drafted reports. Clark Decl Exs. 3, 4.  In those reports, they variously claim that Farkarlun "began to struggle" or "kept turning away from the wall" or was "uncooperative" or was  "struggling" or "physically resisted."  Id.  All of these statements are true; the recording shows that Farkarlun was uncooperative in that she would not answer medical questions, turned away from the wall twice,

and would not get on the ground.  Therefore, the Hennepin County Defendants are entitled to summary judgment on this theory of liability as well.

### 10.  State Law Claims Against Hennepin County Defendants

In addition to her claims under federal law, Farkarlun asserts state law claims for assault and battery against the Hennepin County Defendants.  Am. Compl. ¶¶ 38–44.  In Minnesota, "official immunity" provides a public official with a defense to state law claims.  Mumm v. Mornson, 708 N.W.2d 475, 490 (Minn. 2006).  Official immunity protects discretionary conduct unless an official commits a "willful or malicious wrong."  Elwood v. Rice County, 423 N.W.2d 671, 679 (Minn. 1988).  A willful or malicious wrong is an act that an official "has reason to believe is prohibited."  Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991).  Based on the information they possessed and Farkarlun's resistance on the scene, none of the Hennepin County Defendants had reason to believe any use of force on Farkarlun was prohibited, and they are entitled to official immunity and summary judgment.

### IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants Klimmek and Landmesser are voluntarily **DISMISSED** by Plaintiff;

2.    The Hennepin County Defendants' Motion for Summary Judgment [Docket No. 35] is **GRANTED**; and

45

3.      The Minneapolis Defendants' Motion for Summary Judgment [Docket No. 44] is

**GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


        s/ Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: March 2, 2012.